UNITED STATES, Appellee

v.

DAVID J. BORNER, Sergeant, NATHANIEL HOWARD, Sergeant, and CLIFFORD E. WARE, Private E–2, U. S. Army, Appellants

3 USCMA 306, 12 CMR 62

Nos. 1284, 1394 and 1468

Decided September 11, 1953

George R. Thurston, Esq., Lᴛ Coʟ James C. Hamilton, U. S. Army, Lᴛ Coʟ George M. Thorpe, U. S. Army, and 1sᴛ Lᴛ Michael E. McGarvey, U. S. Army, for Appellants.

Lᴛ Coʟ William R. Ward, U. S. Army, Lᴛ Coʟ Thayer Chapman, U. S. Army, and 1sᴛ Lᴛ Joseph C. Chandler, U. S. Army, for Appellee.

ROBERT E. QUINN, Chief Judge:

Upon their joint trial by general court-martial in Korea, Sergeant Nathaniel Howard, Sergeant David J. Borner, and Private Clifford E. Ware, members of the 9th Infantry Regiment, were convicted of felony murder of a Korean in violation of Article 118, Uniform Code of Military Justice, 50 USC § 712, and of rape in violation of Article 120 of the Code, *supra,* 50 USC § 714. Sergeants Howard and Borner were sentenced to death and intermediate appellate agencies have affirmed their sentences. Their cases are before this Court for mandatory review under the provisions of Article 67(*b*)(1) of the Code, *supra,* 50 USC § 654. Private Ware was sentenced to dishonorable discharge, total forfeitures, and confinement at hard labor for life, and his sentence has been affirmed by intermediate appellate agencies. We granted his petition for review to consider assignments of error hereinafter more fully described.

The tragic events giving rise to the charges occurred in a Korean village. On Sunday, October 28, 1951, the accused secured .45 caliber pistols and went into the hills hunting birds. While so engaged, they entered the isolated village of Sobob-ri. As they approached one of the houses in the village, Howard expressed a desire for sexual intercourse. With this Howard and Borner entered the home occupied by Choe Seok Ok and her sister-in-law, Kim In Wha, and three children. The children were chased from the room and as Choe Seok Ok attempted to flee Howard seized her and drew her back into the room. Kim In Wha concealed herself beneath some blankets on the floor. Borner and Ware remained outside, and, with pistols drawn, took up positions at the door. Howard then struggled with his victim until she fell to the floor. After stripping her clothing from the lower portion of her body he effected penetration. At this, the victim screamed and fainted. The sounds of the struggle were heard by Borner and Ware as well as by several Koreans in the vicinity. One of them, Lee Chin Yong, the husband of Kim In

Wha, sought to drive the accused away from the house. As he started through the door one of the accused, unidentified, fired a shot. The other Koreans picked up sticks and stones and Ware and Borner ran toward a rice paddy nearby, followed by Lee Chin Yong and Howard. At least two more shots were fired at this time. When the accused had departed, the body of Lee Chin Yong was discovered some 50 to 100 yards from the house. He had been killed by a bullet which had pierced his windpipe and left lung and had emerged at a point below his shoulder blade. On the following day, Choe Seok Ok was examined by an American medical officer who observed numerous scratches and bruises on the upper part of her face and in the area of her right jaw as well as two black eyes. There was no injury to the perineal area nor was any evidence of semen found.

After leaving the scene, pursued by the Koreans, the accused separated. Howard and Ware returned to camp. As Borner passed through the area occupied by French Troops, he was pointed out to an officer by his Korean pursuers and apprehended. Each of the accused was questioned by representatives of the Criminal Investigation Division. In their statements Howard described his activities on the afternoon in question and stated that he had entered the house in the Korean village and had remained therein "for a minute." He did not "mess" with the women of the household nor did he have any intentions of so doing. While in the house, he heard a shot fired and ran out followed by a Korean who pursued him with a shovel. Howard turned and fired one shot at his pursuer who was about four feet away but he did not believe he struck him. He then left the area. Borner stated that upon observing some women in the village, Howard expressed a desire for sexual intercourse. When Borner indicated distaste, Howard said "You guys watch the door then," and entered the house. While Howard was inside he heard sounds emanating from the room and a Korean ran up and attempted to open the door. The other Koreans started to

**309**

mill around. With this, he called to Howard and all started to run from the scene. In his flight, he turned and fired his pistol into the ground. Shots were fired by the others as well. Ware's statement was substantially the same as Borner's. While he asserted that several shots were fired, he denied that he had fired any.

At the trial, each of the accused remained silent, but evidence of their good character was introduced through several witnesses.

Each has filed separate assignments of error which we will consider applicable to all unless otherwise noted. These assignments will be disposed of in the order of their presentation.

I

At the commencement of trial, motions for severance were made in behalf of each accused. In support of these motions it was argued that the pretrial statements of each would materially prejudice the others, and, that the defense of each accused would be inconsistent with the defense of his co-accused.

Although a statement of one accused may implicate his co-accused, this factor alone does not require severance. Under such circumstances, as a general rule, instructions by the law officer that the court may consider the statement as evidence only against the accused who made it, provide adequate safeguards against prejudice to the co-accused. Paragraph 140b, Manual for Courts-Martial, United States, 1951; Commonwealth v. Bingham, 158 Mass 169, 33 NE 341, 342; Lucas v. United States, 104 F2d 225, 226 (CA DC Cir); Hall v. United States, 168 F2d 161 (CA DC Cir). In this case no special circumstances were presented by the defense to preclude application of the general rule on this ground. The second ground advanced in support of this motion, namely, conflicting defenses, while asserted, was not established. In fact, no attempt was made to demonstrate such a conflict. In the absence of such a showing, the motion for severance was properly denied. United States v. Evans and Parker, 1 USCMA 541, 4 CMR 133, decided August 8, 1952. Moreover, our review of the record fails to disclose any prejudice to the accused arising out of the fact that they were tried jointly, nor has any reasonable possibility of such prejudice been pointed out by the defense. Accordingly, we conclude that the first assignment of error is without merit.

II

It is next contended that the law officer's denial of a request to view the scene of the offenses was error. In this particular, paragraph 54e, Manual for Courts-Martial, United States, 1951, provides:

"In exceptional circumstances, the court, in the exercise of its sound discretion may proceed to view or inspect the premises or place or an article or object if such view or inspection is necessary to enable the members better to understand and apply the evidence in the case. . . . The view should not be undertaken if the court is already familiar with the premises involved, or if photographs, diagrams, or maps adequately present the situation. . . . ."

Action upon a request for a view rests solely in the sound discretion of the law officer. Where, as here, photographs of the house in question, and the surrounding area, as well as a sketch of the scene were received in evidence, and adequately describe the site, it cannot be said that the law officer abused his discretion, or that the accused were in any way prejudiced by the action taken. This contention is therefore without merit.

III

During the trial the defense moved to segregate Choe Seok Ok and Kim In Wha from the other prosecution witnesses. This motion was denied by the law officer who instructed the witnesses to refrain from discussing their testimony with anyone except counsel or the accused. The procedure followed is expressly provided for by paragraph 53f of the Manual, supra. The purpose of such instruction is to prevent the false

shaping of testimony through collusion, coercion, or other means. Had any effective attempt been made to influence the testimony of any witness after trial had begun, such a fact could have been established by reference to the pretrial statements of the witnesses, by cross-examination, and by direct testimony. In the absence of any showing of such an attempt, there was no error in the course adopted in this instance.

### IV

Both Howard and Borner contend that their pretrial statements were involuntarily made and ▄▄▄▄▄ ■ should not have been received in evidence. Howard, testifying for the limited purpose of contesting the introduction of his statement, asserted that the investigator had informed him that making a statement would probably help him. No other basis of involuntariness is assigned. Obviously, this claim, even if believed, is insufficient to destroy voluntariness. Paragraph 140a, Manual for Courts-Martial, United States, 1951, page 249. United States v. Colbert, 2 USCMA 3, 6 CMR 3, decided October 3, 1952. Howard's contention is similarly without foundation. United States v. Monge, 1 USCMA 95, 2 CMR 1, decided January 8, 1952; United States v. Sapp, 1 USCMA 100, 2 CMR 6, decided January 8, 1952; United States v. Colbert, *supra*.

### V

While under questioning, Sergeant Howard asked the investigator to help him in any way he could, ▄▄▄▄▄ ■ and offered to give him a check at the end of the month for his assistance. Two witnesses described this proposal and the prosecution relied upon it as an additional admission of guilt. The law officer did not instruct the court to consider this admission as evidence against Howard nor did the defense make a request for such instruction. This failure is the subject of an assignment of error by Borner and Ware. Unquestionably, when evidence of admissions is received at a joint trial, limiting instructions should be given by the law officer. In the instant case, the law officer explicitly instructed the court to this effect on five occasions when the pretrial statements of each of the accused were received. The last such instruction was given immediately prior to the receipt of this evidence. The court members therefore were well aware of the law relating to admissions and of their responsibility under the circumstances. We cannot assume that they disregarded their instructions when considering the effect of this admission.

### VI

It is next contended that the evidence is insufficient to support the findings. The testimony of the victim ▄▄▄▄▄ ■ of the rape adequately described all essential elements of that offense except the identity of the perpetrator. The details of her testimony were corroborated by the testimony of other witnesses, as well as by the evidence of the victim's physical appearance and condition immediately after the attack. These circumstances eloquently bespeak the purpose of the assailant, and leave no doubt of its accomplishment. The identity of Howard, as the soldier who remained in the room after the children had been driven out, and, thus, as the perpetrator of the crime, was established by his pretrial admission. No problem relative to his guilt of the offense of rape is presented, for this was established by unrebutted, substantial, and conclusive evidence.

The pretrial statements of Borner and Ware establish with finality their knowledge of Howard's purpose upon entering the Korean home. Each admitted his awareness of the sounds of a noisy struggle terminating in a final scream of terror by the victim. Despite these facts, they remained at the door, menacing the villagers with their drawn pistols and effectively protecting the principal wrongdoer in the commission of his crime. These actions constitute aiding and abetting within the meaning of Article 77 of the Code, *supra*, 50 USC § 671, and effectively remove all doubt as to their guilt. Paragraph 156, Manual for Courts-Martial, United States, 1951; United States v. Marshall and Shelton, 2 USCMA 54, 6 CMR 54, decided November 14, 1952.

**311**

The principal assignment of error is addressed to the findings under the murder charge. The defense █ very ably urges upon us the view that the crime of rape, if committed at all, was completed and the accused were fleeing the scene at the time Lee Chin Yong was killed. Consequently, there being no evidence of concert of action to accomplish his death and no conclusive evidence of the identity of his killer, the convictions of each of the accused must be reversed.

Article 118 of the Code, *supra*, defines as murder an unlawful killing while engaged in the perpetration or attempted perpetration of burglary, rape, sodomy, robbery, or aggravated arson. In explanation of this paragraph, paragraph 197*g* of the Manual, *supra*, states:

"... Experience has shown that the commission or attempted commission of these offenses is likely to result in homicide. The law recognizes this probability, and when an unlawful killing occurs as the consequence of the perpetration or attempted perpetration of one of these offenses, the killing is murder. ..."

This provision represents the prevailing view in the vast majority of civilian jurisdictions. Under this view, it is not necessary that the felony perpetrated or attempted, and the death, coincide in point of time. Commonwealth v. Osman, 284 Mass 421, 188 NE 226, 228. All that is required is the establishment of a causal connection between the crime and the death. This conclusion is compelled by a consideration of several cases relied upon by the Government.

Commonwealth v. Gricus, 317 Mass 403, 58 NE2d 241, the Supreme Judicial Court of Massachusetts declared:

".... [I]t does not follow that the 'commission' of the rape ends the instant penetration ceases. Even though the killing took place after that instant, if the killing was connected with any incident to the rape, and took place substantially at the scene of the rape, the killing could be found to have been 'committed ... in the commission or attempted

commission of' the rape ... and consequently murder in the first degree."

In State v. Habig, 106 Ohio St 151, 140 NE 195, the defendant had participated with several others in a robbery. Upon its completion the criminals fled. A policeman, informed of the robbery, gave chase. When he overtook them several blocks from the scene, he was fatally injured by one of the robbers. The Ohio Supreme Court affirmed a conviction of murder under these circumstances stating:

"... The alarm was so quickly sounded, the pursuit so immediately begun, and so continuously pursued to the point where the homicide was committed, that the conclusion must be reached that the homicide was committed by Habig while perpetrating the robbery, and as a part of the res gestae."

Again in Conrad v. State, 75 Ohio St 52, 78 NE 957, the court in discussing the relationship of homicide to a burglary declared:

".... [T]he burglar must go to the building; he must break and enter it; he may effect his purpose or attempt it, and he must come away; for the very nature of the transaction implies that the burglar will not remain in the building. An infinite variety of things may appear in carrying out the crime. The perpetrator may kill a man while going to or trying to enter the building, he may kill a man after he had broken and entered the house, and he may kill a man while trying to escape, either in the house or outside of it. Can any sound reason be suggested why the killing in any one of these instances might be in the perpetration of or attempt to perpetrate a burglary, and not so in others? The crime of murder ... certainly cannot by any reasonable construction be confined to the moment of breaking and entering the house, the crucial point of the definition of burglary. ..."

Finally, in MacAvoy v. State, 144 Neb 827, 15 NW2d 45, a conviction of felony

murder was sustained although it did not clearly appear that the killing had occurred during the commission of the acts constituting rape upon which the charge was predicated.

In the instant case, it is clear that Howard was perpetrating the crime of rape when the murder victim first attempted to force his way into the house to prevent it. It was at this point that the first shot was fired by one of the accused, thus precipitating the efforts of those nearby to drive them from the scene. While Howard desisted from his course of conduct at this point, he did so only because of the intervention of the Koreans. During this intervention and the resistance of the accused to it, Lee Chin Yong was fatally wounded either at the door or within a few yards of it. Under these circumstances, the failure of the evidence conclusively to establish the identity of the actual killer is immaterial. The crime of rape was in progress within the meaning of Article 118 (4), *supra,* and each of the accused is equally guilty as a principal.

Other minor claims of error have been fully considered, but we find in them no substantial merit. Consequently, a detailed treatment of them is unnecessary to a proper disposition of this case. United States v. Jarvis, 1 USCMA 368, 3 CMR 102, decided May 6, 1952.

The decision of the board of review is affirmed.

Judges LATIMER and BROSMAN concur.